[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————

No. 11-13585

———————

D.C. Docket No.   1:11-cr-20161-KMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YURI IZURIETA,
ANNERI IZURIETA,

Defendants-Appellants.

———————

Appeal from the United States District Court
for the Southern District of Florida

———————

(February 22, 2013)

Before CARNES and COX, Circuit Judges, and RESTANI,[*] Judge.

———————

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

RESTANI, Judge:

Defendants-Appellants Yuri Izurieta and Anneri Izurieta appeal their convictions and sentencing for a conspiracy to unlawfully import goods into the United States in violation of 18 U.S.C. § 545 and 18 U.S.C. § 371.   For the following reasons, we vacate the convictions of both of the Izurietas.

## BACKGROUND

Anneri and Yuri Izurieta are the founders and officers of Naver Trading Corp., a company that imports cheese, butter, and bread from Central America for distribution in the United States.   As part of the U.S. importation regime for food products, all imports are screened upon entry at three distinct stages.   First the goods are examined by officials from Customs and Border Protection ("Customs") for compliance with entry documentation regulations.   See 19 C.F.R. § 141.86(a). The goods are then approved for entry by the Department of Agriculture.   See 19 C.F.R. § 12.8.   Finally, food products are subject to inspection by the Food and Drug Administration ("FDA") under the Federal Food, Drug, and Cosmetic Act, ch. 675, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301–399f).   To facilitate the importation and storage of covered goods, the FDA and Customs permit importers to take possession of their goods under a conditional release, pending test results or further inspection, provided the goods are securely stored in

2

the importer's warehouse pursuant to "such bond or other security as may be prescribed by [the Secretary of the Treasury] . . . ."  19 U.S.C. § 1499(a)(1).  The goods are considered to be on "hold" and may not be distributed until formal authorization for entry into the commerce of the United States is provided by the FDA.  21 U.S.C. § 381.  Under the regulations, an importer may be required to make the held goods available for inspection.  See 19 C.F.R. § 141.113(c); 21 C.F.R. § 1.90.  Ultimately, if the goods are found to be adulterated, the FDA may demand under the applicable regulation that the goods be "redelivered" to Customs for exportation or supervised destruction.  See 21 U.S.C. § 381(a); 19 C.F.R. § 141.113(c).

In this case, the Izurietas and Naver Trading[1] were charged with seven separate counts.  Count 1 charged a conspiracy to unlawfully import in violation of 18 U.S.C. § 371.  Counts 2–7[2] charged the Izurietas with the failure "to redeliver, export, and destroy with FDA supervision" five shipments.[3]  Additionally, Count 3 also charged the Izurietas with failing "to hold and make available for examination"

---

[1] Although Naver Trading was tried with the Izurietas as a co-defendant and found guilty, it is not a party to this appeal.

[2] Count 6 was voluntarily dismissed by the prosecutor prior to trial.

[3] The Izurietas stipulated for trial that the shipments in question were all contaminated, to various extent, with E. coli, Staphylococcus aureus, and/or Salmonella.

3

one shipment.   The Izurietas were found guilty after a jury trial in which FDA

officials and the Izurietas' customs broker testified.   The Izurietas appealed their

convictions and sentencing based on alleged violations of their Sixth Amendment

rights to confront witnesses, improper statements made by the prosecutor over the

course of trial, and faulty calculations underlying their sentences.

## JURISDICTION

At oral argument, we sua sponte raised the question of whether the indictment

(attached to this opinion) underlying the convictions in this case sufficiently charged

a crime, thereby conferring subject-matter jurisdiction on both the district court and

this court.   In particular, the court questioned whether Counts 2–7, charging the

Izurietas with unlawful importation in violation of 18 U.S.C. § 545, sufficiently

alleged crimes.   The unlawful importation charge in the indictment was based on

violations of a Customs regulation, alleging the "failure to deliver, export, and

destroy with FDA supervision" certain imported goods found to be adulterated.   See

19 C.F.R. § 141.113(c).   Failure to comply with the regulation typically gives rise

to a civil remedy of liquidated damages in the amount of three times the value of the

goods.   Id. § 141.113(c)(3).

The parties were permitted to file supplemental letter briefs following oral

argument on two issues: 1) may the court sua sponte raise the question of the

sufficiency of the indictment on appeal, and if so, 2) does the indictment sufficiently allege a crime?

The answer to the first question is clear in light of our previous opinions explaining that a court may raise sua sponte jurisdictional issues up until the issuance of the mandate on direct appeal.   See United States v. Elso, 571 F.3d 1163, 1166 (11th Cir. 2009); United States v. Seher, 562 F.3d 1344, 1359 (11th Cir. 2009). Fed. R. Crim. P. 12(b)(3)(B) permits a court, "at any time while the case is pending . . . to hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense."   In Seher, we held that this court is required to raise sua sponte the jurisdictional issue of whether the indictment sufficiently alleges an offense in violation of the laws of the United States provided the mandate has not issued on direct appeal.   Seher, 562 F.3d at 1359.   The government cites to the unpublished opinion in United States v. Searcy for the proposition that the precise date on which a case is no longer pending for purposes of Fed. R. Crim. P. 12(b)(3)(B) has not been firmly established.   See 278 F. App'x 979, 981(11th Cir. 2008).   Unpublished opinions are not binding precedent.   See 11th Cir. R. 36-1, IOP 6 ("Citation to Unpublished Opinions by the Court.   The court generally does not cite to its 'unpublished' opinions because they are not binding precedent.").   In any event, we draw the line at the issuance of the mandate.   Until the mandate

5

issues, the court is required, if it has any doubt about the matter, to determine whether the indictment states an offense.

The government's citation to the Supreme Court's opinion in United States v. Cotton is equally unpersuasive.   See 535 U.S. 625, 630–31 (2002).   In dicta, the Supreme Court in Cotton quoted an older opinion of Justice Holmes explaining that "[t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case."   Id. (quoting Lamar v. United States, 240 U.S. 60, 65 (1916)).   This court's post-Cotton jurisprudence, however, has refused to find that Cotton altered our established precedent recognizing that the failure to allege a crime in violation of the laws of the United States is a jurisdictional defect. United States v. Peter, 310 F.3d 709, 713–14 (11th Cir. 2002); see United States v. McIntosh, 704 F.3d 894, 901–03 (11th Cir. 2013) (differentiating between jurisdictional and technical defects in indictments).   Accordingly, we address the merits of the jurisdictional question.

We have not addressed squarely the second question briefed by the parties, and there appears to be a circuit split on the key question as to what "law" must be violated for importation to be "contrary to law" under the charged statute, 18 U.S.C. § 545.   See United States v. Place, 693 F.3d 219, 228–29 n.12 (1st Cir. 2012)

6

(collecting cases).[4]   Under the smuggling statute:

> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation,[5] knowing the same to have been imported or brought into the United States <u>contrary to law</u> . . . Shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 545 (emphasis and footnote added).

Recently, the Ninth Circuit in <u>United States v. Alghazouli</u> adopted a relatively narrow interpretation of the statute.   517 F.3d 1179, 1187 (9th Cir. 2008).   The court decided that regulations are included within the definition of "law" for purposes of 18 U.S.C. § 545 only "if there is a statute (a 'law') that specifies that violation of that regulation is a crime."   <u>Id.</u> (ultimately finding that violation of the charged regulation was criminalized under a section of the Clean Air Act); <u>see also</u> <u>United States v. Lawson</u>, 377 F. App'x 712, 716 (9th Cir. 2010) (finding a violation of regulations related to the Convention on International Trade in Endangered Species punishable under 18 U.S.C. § 545 because violation of the regulations was

---

[4] The First Circuit did not decide in <u>Place</u> which sister circuit to follow.   <u>Place</u>, 693 F.3d at 228 n.12.   Because the appellant in that case made only an "all-or-nothing" argument that no regulations could be included within the scope of "law" under 18 U.S.C. § 545, the First Circuit decided not to address "this delicate point."   <u>Id.</u>

[5] "Importation" is the "bringing [of] an article into a country from the outside" whether or not legally entered or unloaded.   <u>Tomplain v. United States</u>, 42 F.2d 203, 205 (5th Cir. 1930).

criminalized under the Endangered Species Act).

The Ninth Circuit arrived at its conclusion by comparing 18 U.S.C. § 545 with 18 U.S.C. § 554. Alghazouli, 517 F.3d at 1187–88. The latter section, which was newly enacted in 2006,[6] prohibits the fraudulent or knowing exportation from the United States of goods "contrary to any law or regulation of the United States." 18 U.S.C. § 554 (emphasis added); Alghazouli, 517 F.3d at 1186 n.3. Applying common principles of statutory construction, the court reasoned that the word "law" in 18 U.S.C. § 554 must not include regulations, otherwise the later mention of regulations would be superfluous. Id. at 1187. The court then imposed this interpretation of "law" in 18 U.S.C. § 554 on the phrase "contrary to law" contained in 18 U.S.C. § 545. Id.

The Ninth Circuit also relied on older Supreme Court precedent which held, "[i]t is necessary that a sufficient statutory authority should exist for declaring any act or omission a criminal offence . . . ." Id. at 1185 (citing United States v. Eaton, 144 U.S. 677, 688 (1892)). The Supreme Court in Eaton rejected the government's application of criminal penalties to a violation of a bookkeeping regulation under the

---

[6] Although 18 U.S.C. § 545 was also amended in 2006 as part of the Patriot Reauthorization Act, the only change was to extend the maximum sentence for a violation of the section from five to twenty years. Alghazouli, 517 F.3d at 1186. The general content of 18 U.S.C. § 545 has remained substantially unchanged since 1930. See Act of June 17, 1930, Pub. L. No. 71-361, 46 Stat. 590, 751 (1930).

Oleomargarine Act.   144 U.S. at 688.   The statute in the case imposed criminal penalties for violations of "any of the things required by law in the carrying on or conducting of his business . . . ."   Id. at 685.   But see United States v. Howard, 352 U.S. 212, 216 (1957) (limiting Eaton to "its special facts" and recognizing that the violation of regulations may or may not give rise to criminal liability based on the structure of the underlying statute).

By contrast, the Fourth Circuit has adopted a more expansive reading of 18 U.S.C. § 545.   See United States v. Mitchell, 39 F.3d 465 (4th Cir. 1994).   The Fourth Circuit began its analysis in Mitchell with the proposition that "[i]t has been established in a variety of contexts that properly promulgated, substantive agency regulations have the 'force and effect of law.'" Id. at 468 (citing Chrysler Corp. v. Brown, 441 U.S. 281, 295–96 (1979)).   After reviewing the legislative history of the section, the court determined that 18 U.S.C. § 545 criminalizes importation in violation of any regulation "having the force and effect of law."   Id. at 470.

In classifying the regulation at issue in that case as one having the force and effect of law, the court adopted a three-pronged test from Chrysler.[7]   Id.   The court first looked to whether the regulations were "'substantive' or 'legislative-type' rules,

---

[7] Chrysler involved analysis of whether under 18 U.S.C. § 1905 a disclosure of information by an agency is "authorized by law" if such disclosure is permitted by an agency's regulations. 441 U.S. at 295.

9

as opposed to 'interpretive rules, general statements of policy, or rules of agency organization, procedure or practice.'" Id.   The court then considered whether the regulations were promulgated pursuant to delegated quasi-legislative authority.   Id. Finally, it addressed whether the regulations were issued in conformity with congressionally-imposed procedural requirements such as the notice and comment provisions of the Administrative Procedure Act.[8]   Id.

The Fourth Circuit's general interpretation of "law" appears consistent with the precedent of the former Fifth Circuit, which is binding on this court.   See Babb v. United States, 252 F.2d 702, 707 (5th Cir. 1958) ("There is nothing to indicate that the term 'contrary to law' as used in [18 U.S.C. § 545] is limited to laws for the violation of which a penalty is imposed.").   The court also concludes that in some cases this approach may reflect the likely intent of Congress in light of the pervasive nature of administrative law, which the Supreme Court has often recognized as the full equivalent of statutory law, absent evidence of congressional intent to the contrary.   See, e.g., Howard, 352 U.S. at 216.   We are not persuaded by the Ninth Circuit's reasoning resulting in complete rejection of regulatory law absent a coordinate criminal statute.   The Ninth Circuit's approach is principally based,

---

[8] In applying its test, the court clarified that under the third prong regulations promulgated prior to the enactment of the APA are required to meet only procedural requirements existing at the time of enactment.   Mitchell, 39 F.3d at 471 n.8.

10

unconvincingly, on a statutory reading of 18 U.S.C. § 545 comparing its language with 18 U.S.C. § 554, a statute enacted decades after 18 U.S.C. § 545. Further, we find it unnecessary to reach such a sweeping result in order to consider the regulation before us, which has not been addressed in any of the cases discussing whether regulations are the subject of 18 U.S.C. § 545.

We are concerned, however, with the breadth of the Fourth Circuit's three-prong approach, derived from a non-criminal context. In contrast, lenity remains an important concern in criminal cases, especially where a regulation giving rise to what would appear to be civil remedies is said to be converted into a criminal law. As the Supreme Court has explained: "The rule of lenity is premised on two ideas: First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity." Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 704 n.18 (1995) (internal quotation marks omitted). When ambiguity exists, "the ambit of criminal statutes should be resolved in favor of lenity." United States v. Bass, 404 U.S. 336, 347 (1971). The rule is a limited one, however, applying only where there is a "grievous ambiguity or uncertainty" in the statute. Chapman v. United States, 500 U.S. 453, 456 (1991). The lack of reference in 18 U.S.C. § 545 to violations of

11

regulations does create some ambiguity and such ambiguity should be considered grievous where the text or history of the regulation creates a strong perception that a violation of the regulation will give rise to civil remedies only.[9]

The court turns now to the indictment in the present case.   The court will examine only whether 19 C.F.R. § 141.113(c) meets this test because it is the one regulation defendants were charged with violating in Counts 2–7.[10]   See Babb, 252 F.2d at 703–04 (requiring the indictment to specifically allege which law was violated in 18 U.S.C. § 545 cases); see also Russell v. United States, 369 U.S. 749, 765 (1962) (requiring the indictment to "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the

---

[9] The government spends considerable space in its letter brief arguing that a statute may impose both criminal and civil sanctions for the same act or criminalize the same act under multiple statutes.   This argument is undoubtedly true; however, it misses the problem discussed here of a regulation that appears to be exclusively civil and that is said to be also a criminal law by operation of an unrelated statute.

[10] In its letter brief, the government argues that it alleged violations of a variety of statutes and regulations in the indictment.   Based on the evidence presented at trial, the court agrees that the government may have been able to pursue convictions under a variety of laws, including 18 U.S.C. § 549, 21 U.S.C. §§ 331(a), 333(a), etc.   In fact, Anneri Izurieta had her probation revoked after her probation officer alleged violations of 21 U.S.C. §§ 331(a), 333(a)(2).   See United States v. Izurieta, 471 F. App'x 863, 865 (11th Cir. 2012).   Contrary to its submission, however, the government failed to actually allege violations of any of these statutes or regulations.   Although Counts 2–7 adopt paragraphs 1–10 of the "General Allegations" section of the indictment, these paragraphs largely lay out the regulatory framework for importation in general terms.   They do not allege unlawful conduct by the Izurietas.   The only conduct alleged to be unlawful in Counts 2–7 is the "failure to redeliver, export, and destroy with FDA supervision" or "failure to hold and make available for examination," mandates contained only within 19 C.F.R. § 141.113(c).   Although some of this language also appears within 21 U.S.C. § 381(a), that language is directed towards the Secretary of the Treasury and not an importer.

12

offence").

The regulation with which the Izurietas are charged with violating here, 19 C.F.R. § 141.113(c), has been in force in its current form since May 1, 2007. See Conditional Release Period and CBP Bond Obligations for Food, Drugs, Devices, and Cosmetics, 72 Fed. Reg. 4423, 4429 (Jan. 31, 2007) (to be codified at 19 C.F.R. pts. 113, 141, 151); see also Entry, Examination, Classification, and Appraisement of Merchandise; Liquidation of Duties, 38 Fed. Reg. 17,443, 17,446 (July 2, 1973) (promulgating the previous version of the regulation which similarly required redelivery of goods denied admission but previously released from Customs' custody). It became effective after a robust notice and comment period in which over 140 comments were received. See Conditional Release Period and CBP Bond Obligations for Food, Drugs, Devices, and Cosmetics, 72 Fed. Reg. at 4425. Further, the regulation was issued under the authority of a variety of statutes, including among others, 21 U.S.C. § 381(a) and 19 U.S.C. §§ 1499, 1623. See 19 C.F.R. § 141.113. These statutes set out conditions under which goods may be delivered out of Customs' custody pending admission as well as the procedures by which the goods may be recalled and examined. Additionally, 21 U.S.C. § 381(a) precludes admission of adulterated goods and mandates that the Secretary of the Treasury destroy or export adulterated food items within 90 days. Notably, none of

13

these provisions that authorize the conditional release system establish criminal liability for a failure to comply with the provision itself, referring instead to only civil remedies.   For example, 21 U.S.C. § 381(b) specifically permits delivery of imported goods to the owner pending an admission determination, provided sufficient bond is given to cover "the payment of such liquidated damages in the event of default as may be required pursuant to regulations of the Secretary of the Treasury."

Although reference to a criminal statute is made in 21 U.S.C. § 381(q)(6) in connection with falsification of entry documents, no reference is made to the conduct or the criminal statute, 18 U.S.C. § 545, actually charged here.   Similarly, although 21 U.S.C. § 331 lays out dozens of prohibited acts in violation of the Federal Food, Drug, and Cosmetics Act subject to criminal penalties, this statute does not specify as a crime the simple failure to hold, redeliver, export, and/or destroy.[11]   19 C.F.R. § 141.113(c) itself, which specifically addresses such a

---

[11] 21 U.S.C. § 331 does criminalize other acts involving the importation or distribution of food and drugs, including: the introduction into interstate commerce of adulterated food, the importation of drugs in violation of § 381(d)(1), the release into commerce of an article imported under § 381(d)(3), the release of an item detained under § 334(h), and the importation of food in violation of § 381(m).   21 U.S.C. § 331(a), (t), (bb), (ee).   Additionally, 18 U.S.C. § 542 criminalizes the introduction or attempted introduction into commerce of goods by means of false statements.   None of these acts, however, was alleged in Counts 2–7 of the indictment.

Count 3 also charges the Izurietas with failure to hold the goods and make them available for inspection.   This could be read to impliedly indicate that the Izurietas introduced or delivered for introduction the goods into interstate commerce.   As discussed below, however, this type of (continued…)

14

failure, specifies only liquidated damages, not criminal punishment, for failure to comply with the regulation.

The regulation at issue, 19 C.F.R. § 141.113(c), is clearly a substantive regulation establishing obligations for importers.   It primarily acts to establish the general contractual terms between Customs and the importer regarding temporary release and storage of the imported goods, along with agreed-upon liquidated damages for non-compliance.   See 19 C.F.R. § 141.113(c); see also 19 C.F.R. § 113.62 (laying out the basic entry bond conditions used by Customs, including a requirement to hold the goods for inspection).   The regulation fails to qualify as a "law" for purposes of criminal liability under 18 U.S.C. § 545 not because it has no effect as a law but because that law is civil only, and in particular reflects contractual requirements.

---

implication is not permitted under the clarity test applied to indictments, at least where the defendant is charged with a violation of 18 U.S.C. § 545.   See Babb, 252 F.2d at 703–04; see also Russell, 369 U.S. at 765.

15

While some regulations may fall under the criminal prohibitions of 18 U.S.C. § 545, the text of 19 C.F.R. § 141.113(c) along with the comments issued during its promulgation certainly indicate to the average person that liability is strictly civil and monetary, capped at most at three times the value of the merchandise secured by bond, and is not aimed at punishment.   See 19 C.F.R. § 141.113(c)(3); see also Assessment of Liquidated Damages Regarding Imported Merchandise That Is Not Admissible Under the Food, Drug and Cosmetic Act, 66 Fed. Reg. 16,850, 16,852–53 (Mar. 28, 2001) (noting that the liquidated damages claimed for failure to redeliver is not intended to be punitive).   In reality, the text of 19 C.F.R. § 141.113(c) sets forth the terms of the contract between the importer and Customs by delineating the obligations of the importer upon conditional release and the damages for a breach of those contractual obligations.   In this case, the statutory and regulatory structure and the history of the regulation demonstrate the vagueness and ambiguity of both the statute and regulation in terms of defining criminal liability.   We disagree with the conclusion of our sister circuit in Mitchell that 18 U.S.C. § 545 is not grievously ambiguous, at least with respect to its effect of criminalizing conduct in violation of 19 C.F.R. § 141.113(c).   See Mitchell, 39 F.3d at 470 (discussing a different regulation having the effect of law).   Rather there is, at a minimum, great doubt as to whether violation of this regulation per se gives rise

16

to criminal liability.    Under principles of lenity, charges of violations of this regulation under 18 U.S.C. § 545 do not charge a crime, and the protections intended by Grand Jury indictment were not afforded the Izurietas.    Accordingly, the convictions of both of the Izurietas on Counts 2–7 are vacated.

The court now turns to the sole remaining count of the indictment, Count 1, alleging a conspiracy under 18 U.S.C. § 371.[12]    Although the Izurietas assume in their briefing that Count 1 cannot stand if Counts 2–7 fail, this may not be so if the indictment for Count 1 lacks the jurisdictional defect of the other counts.    See Wong Tai v. United States, 273 U.S. 77, 81 (1927) (recognizing that an indictment count on conspiracy charges may be sufficient even if it references another substantive count that is found to be insufficient).    In paragraphs three and nine of Count 1, the government alleges that the Izurietas and Naver Trading conspired to distribute or sell adulterated goods.    This allegation in Count 1, unlike the allegations in Counts 2–7, presumably is based upon a statutory crime, 21 U.S.C. § 331(a), and if that were so, it could properly fall within the scope of an "offense

---

[12] 18 U.S.C. § 371 reads:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

17

against the United States" under 18 U.S.C. § 371.   The court, however, observes that the vast majority of Count 1 simply alleges a conspiracy to commit Counts 2–7, conduct that is not criminal.   As explained above, Babb requires the indictment to put the defendants on notice as to which underlying statute they are alleged to have violated.   252 F.2d at 703–04.   The indictment fails to meet this low standard.   A violation of 21 U.S.C. § 331(a) is not alleged anywhere in the indictment. Moreover, the passing mention of unlawful acts in paragraphs three and nine is obscured by the vast majority of the indictment, which focuses on acts that are not criminal in nature.   The indictment was sufficiently unclear as to whether any crime was charged such that the average person could easily read Count 1 as actually charging only a conspiracy to commit non-criminal acts.   See Russell, 369 U.S. at 765.   Thus, we conclude the entire indictment did not adequately set forth a violation of criminal law, and subject matter jurisdiction does not exist.

Because the court vacates the Izurietas' convictions on all counts, the court need not reach the other issues raised on appeal by the parties.

## CONCLUSION

For the foregoing reasons, we **VACATE** the judgment below and the convictions and sentences of both Yuri and Anneri Izurieta in their entirety.

18



Mar 3, 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

# 11-20161-CR-MOORE/SIMONTON
Case No. _____

18 U.S.C. § 371
18 U.S.C. § 545
18 U.S.C. § 2

UNITED STATES OF AMERICA

vs.

YURI IZURIETA,
ANNERI IZURIETA,
and
NAVER TRADING, CORP.,

**Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.      The United States Food and Drug Administration ("FDA") was an agency of the United States that, along with other federal agencies, protected the health of the American public through the enforcement of federal laws and regulations that ensured the safety of food.

2.      When a shipment of food reached the United States from abroad, an importer, or a customs broker acting on its behalf, was required to file entry documents with United States Customs and Border Protection ("CBP"). 19 C.F.R. § 141.1(a). These documents needed to provide the identity, quantity, and origin of the food. 19 C.F.R. § 141.86(a). The food was not considered legally entered into the United States until after the shipment had arrived at the port of entry and the federal government had authorized the delivery of the goods.

3. CBP could place a "hold" on an imported food, prohibiting its sale but allowing its "conditional release." Under a conditional release, the importer of record took physical custody of the consignment but was not permitted to release the product for admission and sale into the United States. Conditional release did not constitute a release of the goods by CBP. 19 C.F.R. § 141.113(c)(1). If the FDA notified the importer that it intended to examine the merchandise, the importer was required to hold the merchandise and make it available to the FDA. 21 C.F.R. § 1.90; 19 C.F.R. § 141.113(c). Upon satisfactory completion of any required sampling, testing, or other procedures, CBP and the FDA released the imported goods. 19 U.S.C. § 1499. If the FDA determined that the food was adulterated or mislabeled, CBP ordered its redelivery into the physical custody of CBP, its destruction, or its exportation. 21 U.S.C. § 381(a); 19 C.F.R. § 141.113(c)(3).

4. A food was deemed to be adulterated if it bore or contained any poisonous or deleterious substance which may render it injurious to health. 21 U.S.C. § 342(a)(1).

5. *Escherichia coli* (abbreviated as *E. coli*) are bacteria that can cause diarrhea, urinary tract infections, respiratory illness, pneumonia, and other illnesses.

6. *Staphylococcus aureus* are bacteria that can cause nausea, vomiting, retching, abdominal cramping, prostration, and transient changes in blood pressure and pulse rate.

7. *Salmonella* are bacteria that can cause diarrhea, fever, and abdominal cramps.

8. Defendant **NAVER TRADING, CORP.**, a registered Florida corporation, was engaged in the business of importing and distributing food, including dairy products, in local and interstate commerce. **NAVER TRADING, CORP.** was a licensed importer of record with both the FDA and CBP and had a principal place of business located at 4941 NW 192nd Street, Miami, FL 33055.

2

9.  Defendant **ANNERI IZURIETA**, a resident of Miami-Dade County, served as the President and Director of **NAVER TRADING, CORP.**

10.  Defendant **YURI IZURIETA**, a resident of Miami-Dade County, was the husband of **ANNERI IZURIETA**.

**COUNT 1**
**Conspiracy to Smuggle Goods into the United States**
**(18 U.S.C. § 371)**

1.  Paragraphs 1 through 10 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.  Beginning on or about April 18, 2007, and continuing through on or about December 23, 2010, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**YURI IZURIETA,**
**ANNERI IZURIETA,**
**and**
**NAVER TRADING, CORP.,**

did knowingly, and with intent to further the object of the conspiracy, combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit an offense against the United States, that is: to fraudulently and knowingly import and bring into the United States any merchandise contrary to law, in violation of Title 18, United States Code, Section 545.

**Purpose of the Conspiracy**

3.  It was the purpose of the conspiracy for the defendants and their coconspirators to unlawfully enrich themselves through the distribution and sale of dairy products which the FDA had detained and after receiving notice from the FDA that the dairy products were suspected to

3

be adulterated with *E. coli*, *Staphyloccocus aureus*, and *Salmonella* and that in some instances they were adulterated with *E. coli*, *Staphyloccocus aureus*, and *Salmonella*.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their coconspirators sought to accomplish the object and purpose of the conspiracy included, but were not limited to, the following:

4.      **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** imported and caused to be imported dairy products and other food from Honduras and Nicaragua.

5.      **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** under-declared and caused to be under-declared the quantity of shipments of dairy products to disguise the full amount of the shipments.

6.      Despite requests to do so from the FDA, **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** failed to disclose the location of shipments of dairy products after learning that the FDA had slated specific shipments for examination due to concerns of adulteration with *E. coli*, *Staphylococcus aureus*, and *Salmonella*.

7.      **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** distributed shipments of dairy products after learning that the FDA had slated specific shipments for examination due to concerns of adulteration with *E. coli*, *Staphylococcus aureus*, and *Salmonella* and which were not authorized for entry into the United States.

8.      **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** failed to redeliver for destruction and exportation shipments of dairy products which the FDA

4

had determined to be adulterated with *E. coli*, *Staphylococcus aureus*, and *Salmonella* and which were not authorized for entry into the United States.

9.     **YURI IZURIETA, ANNERI IZURIETA,** and **NAVER TRADING, CORP.** distributed dairy products which the FDA had determined to be adulterated with *E. coli*, *Staphylococcus aureus*, and *Salmonella* and which were not authorized for entry into the United States.

### Overt Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one of the conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1.     On or about April 18, 2007, **YURI IZURIETA, ANNERI IZURIETA,** and **NAVER TRADING, CORP.** imported and caused to be imported a shipment with entry number BFV-0143458-8.

2.     On or about September 9, 2007, **YURI IZURIETA, ANNERI IZURIETA,** and **NAVER TRADING, CORP.** failed to redeliver, export, and destroy under FDA supervision 4,434 kg of dairy products from shipment BFV-0143458-8 after receiving notice that the FDA refused their admission into the United States due to a concern of adulteration with *Staphylococcus aureus* and *Escherichia coli*.

3.     On or about December 27, 2007, **YURI IZURIETA, ANNERI IZURIETA,** and **NAVER TRADING, CORP.** imported and caused to be imported a shipment with entry number BFV-0153541-8.

4.     On or about June 12, 2008, **YURI IZURIETA, ANNERI IZURIETA,** and **NAVER TRADING, CORP.** failed to redeliver, export, and destroy with FDA supervision

5

4,676 kg of dairy products from shipment BFV-0153541-8 after receiving notice that the dairy products tested positive for *E. coli*, *Staphylococcus aureus*, and *Salmonella*.

5.    On or about April 1, 2009, **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** imported and caused to be imported a shipment with entry number BYV-0093762-9.

6.    On or about April 6, 2010, **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** failed to redeliver, export and destroy 1,027 kg of dairy products from shipment BYV-0093762-9 after receiving a notice from the FDA refusing their admission due to a concern of adulteration with *Salmonella*.

7.    On or about July 17, 2010, **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** imported and caused to be imported a shipment with entry number BYV-0004364-2.

8.    On or about December 7, 2010, **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** failed to redeliver, export, and destroy 96 boxes of dairy products from shipment BYV-0004364-2 after receiving notice from the FDA that the dairy products tested positive for *Staphylococcus aureus* and *Salmonella*.

9.    On or about December 18, 2010, **YURI IZURIETA, ANNERI IZURIETA**, and **NAVER TRADING, CORP.** imported and caused to be imported a shipment with entry number BYV-0004551-4.

10.   On or about December 23, 2010, **YURI IZURIETA, ANNERI IZURIETA,** and **NAVER TRADING, CORP.** arrived at a refrigerated warehouse to distribute 158 boxes of dairy products from shipment BYV-0004551-4 without declaring them on entry paperwork and without making them available for an FDA examination.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 - 7
### Smuggling Goods into the United States
### (18 U.S.C. § 545)

1.   Paragraphs 1 though 10 of the General Allegations section of this Indictment are realleged and incorporated by reference as though set forth fully herein.

2.   On or about the dates specified below with respect to each Count, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**YURI IZURIETA,**
**ANNERI IZURIETA,**
**and**
**NAVER TRADING, CORP.,**

did fraudulently and knowingly import and bring into the United States any merchandise contrary to law, as set forth below:

| Count | Approximate Date | Entry Number | General Description |
|---|---|---|---|
| 2 | 09/09/2007 | BFV-0143458-8 | Failure to redeliver, export, and destroy with FDA supervision approximately 4,434 kg of dairy products |
| 3 | 2/8/2008 | WIG-2045735-2 | Failure to hold and make available for examination, and failure to redeliver, export, and destroy with FDA supervision approximately 84 cartons of bread and dairy products |
| 4 | 6/12/2008 | BFV-0153541-8 | Failure to redeliver, export, and destroy with FDA supervision approximately 4,676 kg of dairy products |

7

| Count | Approximate Date | Entry Number | General Description |
|-------|------------------|--------------|---------------------|
| 5 | 7/17/2008 | WIG-2045978-8 | Failure to redeliver, export, and destroy with FDA supervision approximately 2,576 kg of dairy products |
| 6 | 4/6/2010 | BYV-0093762-9 | Failure to redeliver, export, and destroy with FDA supervision approximately 815 kg of dairy products |
| 7 | 12/7/2010 | BYV-0004364-2 | Failure to redeliver, export, and destroy with FDA supervision approximately 96 boxes of dairy products |

In violation of Title 18, United States Code, Sections 545 and 2.

A TRUE BILL

_____

FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
JAIME A. RAICH
ASSISTANT UNITED STATES ATTORNEY

8