[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10129

_____

DONNA TEALER,

Plaintiff-Appellant,

*versus*

R. BYARS,
A. CATLIN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-02639-LMM

_____

2                      Opinion of the Court                      23-10129

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

PER CURIAM:

This appeal requires us to consider whether the district court properly granted qualified immunity to two DeKalb County police officers who were involved in securing a warrant for the arrest of Plaintiff-Appellant Donna Tealer.  Under the warrant, officers arrested Tealer on charges of felony false imprisonment and misdemeanor battery.  Later, the prosecutor dismissed the false-imprisonment charge.

Tealer sued Defendants-Appellees Officer Robert Byars and Assistant Police Chief Antonio Catlin ("Officers")—the Officers involved in securing her arrest warrant—alleging claims for malicious prosecution and false arrest under the Fourth Amendment, and a Georgia constitutional violation.  The district court dismissed the federal claims and declined to exercise supplemental jurisdiction over the state claim.  After careful review, and with the benefit of oral argument, we affirm the district court's judgment in favor of the Officers.

## I.      BACKGROUND
### A.      Facts[1]

---

[1] Because this appeal is before us on an order on a motion to dismiss, we accept as true for purposes of our review the allegations set forth in Donna Tealer's Amended Complaint and the attachments thereto, and we make all reasonable inferences in Tealer's favor. *See Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003).  For this reason, the actual facts may or may not be as presented.

On the afternoon of March 8, 2020, Tealer was at her son David Tealer's ("David")[2] home. Using a Ring camera application on her cell phone, Tealer observed two white vans parked in her driveway. Because Tealer wasn't expecting any visitors, she suspected a potential burglary and feared for the safety of her 92-year-old mother, who was alone at the house.

David advised his mother to call 911, and he drove her to her house. While David drove, Tealer remained on the call with 911 and continued watching the Ring footage on her phone. She observed one of the white vans leave her driveway while the other remained. Tealer told the 911 dispatcher that she saw a man in a blue shirt retrieve a ladder and climb onto the roof of her home. Based on that sight, Tealer supposed that the man might be stealing her satellite dish or attempting to enter the rear of her home by climbing on the roof. Tealer told the dispatcher that her son was a law-enforcement officer and was armed. David was a law-enforcement officer with the South Fulton Police Department, though at the time of these events, he was off duty.

When the Tealers arrived at Tealer's house, they saw the man in the blue shirt, later identified as Carlos Santos-Mendez, on the roof of the house. David drew his firearm and pointed it at Santos-Mendez. David identified himself as law enforcement and ordered Santos-Mendez to come down from the roof and get on

---

[2] To avoid confusion between Appellant Donna Tealer and her son David Tealer, we refer to Donna Tealer as "Tealer" and to David Tealer as "David."

the ground.  Santos-Mendez initially ignored the commands, but eventually came down from the roof and dropped to his knees.

Meanwhile, Tealer observed a metal hammer at the base of the ladder, close to Santos-Mendez.  She feared that Santos-Mendez might use the hammer to fight back, so she approached Santos-Mendez and tried to force him to lie down by "guiding him at his back."

Santos-Mendez responded by struggling with Tealer as she attempted to force him to the ground.  After holstering his gun, David joined the struggle and ordered Santos-Mendez to put his hands behind his back.

Santos-Mendez ignored the Tealers' commands and attempted to break free.  During the scuffle, Santos-Mendez was speaking on his cell phone in Spanish, and Tealer mistakenly believed that Santos-Mendez was telling the individuals in the first white van to return and assist him in the fight. So Tealer attempted to force Santos-Mendez to comply by striking Santos-Mendez three times on the side of his head with her fist.

Santos-Mendez stopped resisting, and David realized that Santos-Mendez's boss, DelRoy Scott, was on the other end of the cell phone.  Santos-Mendez, too, identified the person on the phone as his "boss."  Scott spoke to David and told David that  he was on his way to the house.  When Scott arrived, he advised the Tealers that he had hired Santos-Mendez to work on Tealer's roof as a subcontractor.

As it turned out, Tealer had previously contracted with Scott to perform roofing repairs on her house. But she had had no contact with Scott since about two weeks earlier. According to Tealer, Scott failed to perform the repairs on the date they agreed upon, Scott never rescheduled the appointment, and Tealer had not heard from Scott in two weeks when Santos-Mendez arrived to work on the roof. Based on these events, Tealer alleges that Scott breached the roofing contract, so it was null and void. And in Tealer's view, Scott had no authority to allow Santos-Mendez to enter her property on March 8th.

About 10-15 minutes after Scott got to the Tealers' home, DeKalb County police officers arrived. Once law enforcement arrived, the Tealers released Santos-Mendez and turned him over to the officers. The officers investigated, interviewing all parties present. They determined that the incident arose from a "misunderstanding" based on the Tealers' mistaken belief that Santos-Mendez was a burglar. The officers released Santos-Mendez. One of the officers completed an incident report in which he identified David as a "suspect" and Santos-Mendez as "the victim."

Between March 9 and 11, 2020, Defendant Officer Robert Byars further investigated the incident. Officer Byars reviewed written statements, body-camera footage, and the Ring camera footage. He also interviewed several witnesses, including Santos-Mendez and David.

Defendant Assistant Police Chief Antonio Catlin—who had supervisory authority over the investigation—stayed apprised of

the facts of the case.  Assistant Chief Catlin also spoke with Tealer over the phone.  Tealer told him, among other things, that she had no agreement with Scott for roofing work on March 8th; that she did not know Santos-Mendez; and that she believed Santos-Mendez initiated an altercation with her.  Assistant Chief Catlin informed Tealer that his office decided to seek arrest warrants for her and David.

On March 12, 2020, Officer Byars submitted applications for arrest warrants to a Georgia Superior Court judge, but the Superior Court judge denied the warrant applications.  Officer Byars later presented warrant applications to a DeKalb County magistrate judge, and the magistrate judge issued the arrest warrants.  According to Tealer, Officer Byars did not inform the magistrate judge that the Superior Court refused to issue the warrants.  The DeKalb Police Department arrested Tealer on charges of felony false imprisonment and battery.

Tealer alleges that Officer Byars's application to the magistrate judge contained material omissions and misrepresentations.  According to Tealer, Officer Byars omitted the following information:

- A Georgia Superior Court previously refused to issue an arrest warrant for Tealer;

- Tealer believed someone was attempting to unlawfully enter her residence;

- Tealer contacted 911 to report the incident;

- David did not hear Santos-Mendez's attempts to tell him that DelRoy Scott was his employer;

- Tealer began a physical altercation with Santos-Mendez after Santos-Mendez "stood up" and became combative;

- Tealer feared that Santos-Mendez would fight back with a nearby hammer;

- Scott breached his previous agreement with Tealer and had no authority to be on Tealer's property on March 8th;

- Scott had not communicated with Tealer for two weeks before the incident;

Tealer also asserts that Officer Byars's warrant application contained the following alleged misrepresentations:

- There was a signed contract to complete work on the roof;

- Santos-Mendez "returned" to Tealer's home to "complete work;"

- It was unclear whether Santos-Mendez had previously worked on the roof;

- Santos-Mendez immediately identified himself as an employee of DelRoy Scott and complied with Tealer's commands;

- Tealer received notification that Santos-Mendez was at the residence;

- Tealer and David called DelRoy Scott;

- David held Santos-Mendez at gun point "the entire time."

After the warrants issued, Tealer was arrested for felony false imprisonment and misdemeanor battery. The prosecutor later dismissed the false-imprisonment charge. But the battery charge remains technically pending, though it has been "dead docketed," meaning the prosecution is postponed indefinitely.

### B.    Procedural History

On July 1, 2022, Tealer sued Officer Byars and Assistant Chief Catlin. Her Amended Complaint, which is the operative pleading here, sets forth Fourth Amendment claims for malicious prosecution and false arrest and a claim for a Georgia constitutional violation. Tealer brought the federal claims under Section 1983, but she did not identify whether she was suing the Officers in their individual or official capacities.

Upon the Officers' motion, the district court dismissed Tealer's false-arrest and malicious-prosecution claims under Federal Rule of Civil Procedure 12(b)(6). As to the false-arrest claim, the district court reasoned that Tealer failed to state a claim because false arrest concerns only "seizures without legal process, such as warrantless arrests." But Tealer acknowledged that she was arrested under a valid warrant that a magistrate judge signed. The court reasoned that Tealer's proper claim, if any, was for malicious prosecution. That said, the district court concluded qualified immunity barred Tealer's malicious-prosecution claim. Finally, the district court declined to exercise supplemental jurisdiction over

Tealer's state claim under the Georgia Constitution. As a result, the district court dismissed all claims. Tealer now appeals.

## II. STANDARDS OF REVIEW

"We review de novo a district court's decision to grant or deny the defense of qualified immunity on a motion to dismiss, accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (citing *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir.2001)). We also review de novo a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023). In conducting our review, we accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019).

As for a district court's decision to decline to exercise supplemental jurisdiction over state-law claims, we review that for an abuse of discretion. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006).

## III. ANALYSIS

Tealer challenges the district court's order on two grounds. First, she argues that the district court incorrectly dismissed her malicious-prosecution claim on qualified-immunity grounds. Second, she asserts that the district court incorrectly declined supplemental jurisdiction over her Georgia claim. We address each issue in turn.

### A.  The district court did not err in dismissing Tealer's malicious-prosecution claim

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Tealer contends that the Officers violated her right under the Fourth Amendment to be free from an unreasonable seizure by engaging in a malicious prosecution of her.

Malicious-prosecution claims are claims of unlawful seizure when legal process occurs.  *Williams v. Aguirre*, 965 F.3d 1147, 1157–58 (11th Cir. 2020).  A Fourth Amendment violation happens if the "legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements."  *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017).  To establish this type of claim, Tealer must show "(1) that the defendant violated [her] Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against [her] terminated in [her] favor."  *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).

There's no question Tealer has satisfied the second element.  Tealer alleges malicious prosecution arising from the false-imprisonment charge lodged against her.  Because the prosecutor dismissed the false-imprisonment charge, those proceedings terminated in her favor.

So we consider whether Tealer has alleged enough facts to establish the first element: "that the legal process justifying [her] seizure was constitutionally infirm" and "that [her] seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165. The legal process justifying a seizure is constitutionally infirm if "the officer who applied for the warrant should have known that his application failed to establish probable cause" or "an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.* A misstatement or omission does not violate the Fourth Amendment if it is immaterial. That is, even if a misstatement or omission occurs, if probable cause would still exist "if the offending statement was removed or the omitted information included," the misstatement or omission is not material. *Paez*, 915 F.3d at 1287. And if no omission or misstatement is material, a plaintiff cannot show that a malicious prosecution has occurred.

### 1.    Claims Against Officer Byars

We first consider Tealer's claims against Officer Byars. Tealer argues that Officer Byars is liable because he applied for her arrest warrant and, in Tealer's opinion, should have known that his application failed to establish probable cause. She also claims that Officer Byars misrepresented and omitted material information in and from the arrest warrant. We disagree. Instead, we conclude that qualified immunity bars Tealer's claims.

Qualified immunity protects police officers from suit in their individual capacities for discretionary actions they have performed in the course of their duties. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection shields officials from suit if their conduct does not violate a clearly established statutory or constitutional right of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is intended to balance the need for official accountability with the need to permit officials to engage in their discretionary duties without fear of personal liability or harassing litigation. *Pearson*, 555 U.S. at 231; *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003). Qualified immunity protects from litigation "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and internal quotation marks omitted). It's intended to "liberate[] government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (citation and internal quotation marks omitted).

To obtain qualified immunity, an officer must first show he was acting within the scope of his discretionary authority when he engaged in the challenged conduct. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). If the defendant makes this showing, the plaintiff "bears the burden of proving both that the defendant violated [her] constitutional right and that 'the right was clearly

established at the time of the violation.'" *Washington v. Howard*, 25 F.4th 891, 897–98 (11th Cir. 2022) (quoting *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012)).

The court will not always have to analyze both steps; if no constitutional violation occurs, "the inquiry ends there." *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005). The court also need not take the steps in any particular order. Rather, the court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236. And because qualified immunity can be a defense from suit—not just liability—"it is 'important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.'" *Lee*, 284 F.3d at 1194 (quoting *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted)).

Clearly established law is law that "makes it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018) (alteration adopted) (quoting *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) (per curiam)). For the law to be clearly established, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish

the particular rule the plaintiff seeks to apply." *Id.* The contours of a clearly established rule are "so well defined" that a reasonable officer would clearly understand "that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). This requires a "high 'degree of specificity'" that is "especially important in the Fourth Amendment context." *Id.* at 63–64 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

In the Eleventh Circuit, only United States Supreme Court precedent, published Eleventh Circuit precedent, and relevant Georgia Supreme Court precedent can clearly establish law. *Bradley v. Benton*, 10 F.4th 1232, 1242–43 (11th Cir. 2021). Because an unpublished opinion is "not binding precedent," *United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013), it cannot clearly establish the law. *Crocker v. Beatty*, 995 F.3d 1232, 1241 n.6 (11th Cir. 2021).

The district court concluded that Officer Byars and Assistant Chief Catlin were performing a discretionary function. Tealer does not contest this holding on appeal. And we agree that this element of qualified immunity is satisfied here because the "pursuit and apprehension of suspected criminals is a core discretionary function of the police." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 n.16 (11th Cir. 2019) (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1289–90 (11th Cir. 2009) (per curiam)).

At the next step, though, Tealer contends that the district court erred in granting qualified immunity because, in her view, the Officers' conduct violates clearly established law. Tealer argues

Officer Byars and Assistant Chief Catlin should have known that the warrant application failed to establish probable cause and that the warrant application intentionally misrepresented and omitted information that, if included, would have vitiated probable cause.

To determine whether a misstatement or omission in an officer's warrant affidavit violates the Fourth Amendment, we use a two-part test. "First, we ask whether there was an intentional or reckless misstatement or omission." *Paez*, 915 F.3d at 1287 (citing *United States v. Kirk*, 781 F.2d 1498, 1502 (11th Cir. 1986)). If so, we determine whether the misstatement or omission was material by considering if the omission or correction of the misstatement or the addition of the omitted statement would undermine probable cause. *Id.* An officer is entitled to qualified immunity if his warrant affidavit would still support arguable probable cause even after the misstatements were corrected or the omissions were added. *See id.* at 1287–88; *Grider v. City of Auburn*, 618 F.3d 1240, 1257 n.25 (11th Cir. 2010).

Tealer asserts that the alleged omissions and misrepresentations were intentional. We assume the truth of her factual allegations. *See Dalrymple*, 334 F.3d at 994. Even so, Tealer's malicious-prosecution claim fails because arguable probable cause existed to arrest her for false imprisonment, even accounting for the alleged omissions and misrepresentations in the warrant affidavit.

"Probable cause 'is not a high bar.'" *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Probable cause "does not require anything close to conclusive proof or proof

beyond a reasonable doubt . . . , or even a finding made by a preponderance of the evidence." *Paez*, 915 F.3d at 1286. Instead, "probable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" *Washington*, 25 F.4th at 898–99 (quoting *Wesby*, 583 U.S. at 57). In a malicious-prosecution case, we ask "whether the judicial officer who made the probable-cause determination had sufficient, truthful information to establish probable cause." *Williams*, 965 F.3d at 1163.

As relevant here, the warrant affidavit that Officer Byars submitted to the magistrate judge averred that probable cause existed to arrest Tealer for False Imprisonment, Georgia Code § 16-5-41. Under Georgia law, a "person commits the offense of false imprisonment when, in violation of the personal liberty of another, [s]he arrests, confines, or detains such person without legal authority." Ga. Code § 16-5-41(a).

Tealer admits that she forcibly and intentionally detained Santos-Mendez on the ground for an extended period. But she contends that the Officers should have known that the detention was justified because Tealer thought Santos-Mendez was a burglar, and she allegedly had authority to effectuate a citizen's arrest of Santos-Mendez.

Tealer also asserts that Officer Byars's warrant affidavit omitted and misrepresented information supporting Tealer's alleged ability to make a lawful citizen's arrest and showing that the

incident was a misunderstanding. And she alleges that Officer Byars made a material omission by failing to inform the magistrate judge that the Superior Court previously denied Officer Byars's application for an arrest warrant, and a material misstatement that Scott was authorized to perform work on Tealer's property on March 8th.

We begin with Officer Byars's knowledge that Tealer thought Santos-Mendez was a burglar. Tealer argues that Officer Byars's warrant application misstated several details relating to Tealer's misunderstanding.

But all these alleged misstatements were immaterial. For starters, even if Tealer believed Santos-Mendez was a burglar, she still did not release him when she learned he worked for Scott. In fact, according to Tealer's own version of the facts, while Santos-Mendez was held on the ground, he identified the person he was speaking to on the phone—DelRoy Scott—as his boss. And Scott informed the Tealers that Santos-Mendez was his subcontractor when he arrived at Tealers' house. Yet Tealer continued to hold Santos-Mendez down until law enforcement arrived—some 10–15 minutes after Scott arrived at her home and told her information that refuted her belief that Santos-Mendez was a burglar.

At best, Tealer's incorrect belief that Santos-Mendez was a burglar relates to the mistake-of-fact affirmative defense under Georgia law. *See* Ga. Code § 16-3-5. But affirmative defenses usually do not undermine probable cause. *Paez*, 915 F.3d at 1286, 1289–90; *see, e.g.*, *Morris v. Town of Lexington*, 748 F.3d 1316, 1325

(11th Cir. 2014); *Jordan v. Mosley*, 487 F.3d 1350, 1356–57 (11th Cir. 2007). "Indeed, arresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." *Paez*, 915 F.3d at 1286 (citation and internal quotation marks omitted).

Probable cause does not require "convincing proof" or "proof beyond a reasonable doubt." *See Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018). Nor is an officer "required to resolve every inconsistency found in the evidence." *Paez*, 915 F.3d at 1286. Similarly, officers aren't lawyers, so we "do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses." *Id.* (citing *Williams v. City of Albany*, 936 F.2d 1256, 1260 (11th Cir. 1991) (per curiam)). So the Officers did not have a duty to resolve this legal question before seeking Tealer's arrest, and Tealer's mistake-of-fact defense does not undermine probable cause here. *See Jordan*, 487 F.3d at 1357 (stating that, "[u]nder the law of probable cause, no police officer had a duty to resolve" a potential affirmative defense "before seeking out Plaintiff's arrest").

Next, Tealer argues that she made a citizen's arrest, so Georgia Code § 17-4-60 authorized her to detain Santos-Mendez. This argument fares no better than the last one.

While § 17-4-60 is now repealed, on March 8, 2020, it provided, "A private person may arrest an offender if the offense is committed in his presence or within his immediate knowledge. If

the offense is a felony and the offender is escaping or attempting to escape, a private person may arrest him upon reasonable and probable grounds of suspicion." Ga. Code § 17-4-60 (repealed May 10, 2021). This argument suffers from the same problem as Tealer's burglar argument. The assertion that Tealer made a citizen's arrest is another defense to the false-imprisonment charge. So Officer Byars was not responsible for determining whether a valid citizen's arrest took place before applying for the arrest warrant.

A reasonable officer also could have concluded that Santos-Mendez did not commit an offense in Tealer's presence and that Tealer lacked reasonable grounds to suspect he was committing a felony. Santos-Mendez arrived at Tealer's house in broad daylight with a ladder and a tool belt. Yet without any investigation, Tealer immediately treated Santos-Mendez as burglar and trespasser. She physically restrained him and struck him on the head three times without any type of inquiry. Tealer took this action even though she knew she had spoken with Scott about roof repairs less than two weeks earlier.

Even if the alleged misstatements in the warrant affidavit were corrected, the magistrate judge could have determined that probable cause existed to conclude that Tealer acted without authority to effectuate a citizen's arrest, and therefore falsely imprisoned Santos-Mendez. Tealer admits that she intentionally detained Santos-Mendez, and the detention lasted well beyond the period that she could have even arguably reasonably believed Santos-Mendez committed a crime. So correcting the alleged

misstatements wouldn't have resulted in a lack of even arguable probable cause.

Tealer also contends that the magistrate judge would have denied the arrest warrant if the magistrate knew that Scott failed to fix Tealer's roof on time and failed to reschedule the appointment. Tealer asserts that Scott's failure breached the contract and that this breach terminated the agreement. So, she reasons, neither Scott nor Santos-Mendez were authorized to be on her property, and she reasonably believed that Santos-Mendez committed criminal trespass under Georgia Code § 16-7-21(b)(1).

Tealer has not shown that the Officers violated the Fourth Amendment under clearly established law. Even if the warrant affidavit documented Scott's failures, at least arguable probable cause supported the conclusion that Tealer falsely imprisoned Santos-Mendez. Again, Tealer agrees that she forcibly and intentionally detained Santos-Mendez and did so even after learning that he was there to fix her roof. That's enough to establish at least arguable probable cause for false imprisonment.

Finally, Tealer contends that the warrant affidavit omitted material information because it did not note that a Georgia Superior Court had allegedly previously refused to issue a warrant for her arrest. Tealer similarly asserts that the Superior Court's refusal to issue an arrest warrant "would have led any reasonable officer to conclude that arguable probable cause was lacking." Again, we disagree.

First, the warrant allegedly presented to the Superior Court wasn't attached to the Amended Complaint so we can't consider its contents. In other words, we can't consider how, if at all, its supporting affidavit differed from the affidavit submitted to the magistrate judge; and we can't judge whether the warrant even pertained to Tealer at all. Second, even if we considered the warrant, the Superior Court's refusal to issue it does not change Tealer's actions on March 8, 2020, or negate arguable probable cause for her arrest. Regardless of the Superior Court's decision, Tealer concedes that on March 8th, she forcibly and intentionally detained Santos-Mendez against his will, despite knowing for at least part of the time she detained him that he was there to fix her roof. This fact was enough to create arguable probable cause for a false-imprisonment charge, even if the magistrate judge knew of the Superior Court's alleged decision.

On a final note, we reject Tealer's suggestion that the district court erred because it failed to follow our decision in *Carter v. Butts County*, 821 F.3d 1310 (11th Cir. 2016). *Carter* simply does not create a clearly established rule applicable to this case. In *Carter*, the defendant police officer's home was foreclosed upon. *Id.* at 1314. The defendant officer received notices of impending foreclosure and subsequent sale, and he knew the new owner would be sending agents to the home to clean it and prepare it for sale. *Id.* at 1321–23. Despite this knowledge, the defendant officer arrived at the house and ordered the arrests of the plaintiff individuals who were preparing the house for sale, claiming that they had committed a burglary, criminal trespass, and theft. *Id.* at 1314-18. The plaintiffs

brought claims against the defendant officer for false arrest under § 1983.  *Id.* at 1322.  We rejected the officer's defense of qualified immunity, finding that the officer "knew that [the property manager] was authorized to enter and clean out the Property" and he had "enough information to know that [they] were not engaged in burglary, criminal trespass, or theft."  *Id.* at 1321.

*Carter* does not suggest—much less clearly establish—that Officer Byars violated the Fourth Amendment.  The officer in *Carter* knew that he arrested the plaintiffs on false pretenses because he had direct knowledge that they were permitted by law in his former home.  *Id.* at 1320.  Here, in contrast, Officer Byars had no direct knowledge of what occurred at Tealer's house.  And in any case, Officer Byars applied for an arrest warrant for false imprisonment because Tealer (by her own admission) intentionally and forcibly detained Santos-Mendez.  Unlike in *Carter*, no facts exist here that so much as suggest Officer Byars arrested Tealer even though he knew she did not commit a crime.

In short, the district court correctly held that Tealer's § 1983 action against Officer Byars is barred by qualified immunity.

2.    Claim Against Assistant Chief Catlin

Although Officer Byars applied for the arrest warrant, Tealer argues that Assistant Chief Catlin is liable as Officer Byars's supervisor and for his failure to intervene.  But as we've already discussed, Tealer did not show that Officer Byars's underlying conduct violated clearly established law.  No matter how much knowledge Assistant Chief Catlin had about the arrest warrant, he

was not directly involved, and the facts do not show that the officer who authored the arrest warrant was engaged in a clear violation of established law. No supervisory liability exists if the underlying conduct does not itself violate the law. *See Paez*, 915 F.3d at 1291 (because officers committed no constitutional violations, their supervisors could not be found liable for violating Section 1983); *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) ("[A] supervisor may not be held liable under section 1983 unless the supervised official committed an underlying violation of a constitutional right.").

And while Tealer suggests that liability exists for failure to intervene, that too fails when no constitutional violation occurred in the first place. *See Williams v. Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023) ("Of course, a failure-to-intervene claim requires an underlying constitutional violation.").

The district court correctly held that Assistant Chief Catlin is also entitled to qualified immunity.

B. *The district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Tealer's state-law claim.*

We also affirm the district court's decision to decline supplemental jurisdiction over Tealer's state-law claim. Tealer concedes that if the district court properly dismissed her federal claims, then the court could decline jurisdiction over the Georgia claim. Because the district court correctly dismissed Tealer's federal claims, the court had discretion to dismiss her Georgia claim. *See* 28 U.S.C. § 1367(c)(3); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639

(2009).  The district court did not abuse its discretion when it declined jurisdiction over the state claim.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's order dismissing Tealer's Amended Complaint.

**AFFIRMED.**